NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

————————————————

Merrimack
No. 2017-0693

THE STATE OF NEW HAMPSHIRE

v.

JEAN CLAUDE MFATANEZA

Argued: February 14, 2019
Opinion Issued: May 10, 2019

Gordon J. MacDonald, attorney general (Sean R. Locke, assistant attorney general, on the memorandum of law and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, C.J. Following a bench trial on stipulated facts, the defendant, Jean Claude Mfataneza, was convicted of aggravated driving while intoxicated. See RSA 265-A:3 (2014). On appeal, he argues that the Trial Court (McNamara, J.) erred in concluding that RSA 265-A:8 (2014) (amended 2016) requires only that the Administrative License Suspension (ALS) warnings be reasonably conveyed by reasonable methods in order to satisfy the statute and be admissible at trial, rather than that the warnings be subjectively understood by the individual driver. We affirm.

The pertinent facts are as follows. On December 12, 2016, the defendant was arrested by Concord police for driving while intoxicated. Upon arriving at the police station, the defendant was placed in a holding cell. At that point, an officer twice asked the defendant, who had emigrated from the Democratic Republic of Congo and who is fluent in Kinyarwanda and Swahili, what language he spoke, to which he replied English. The officer testified that she knew the defendant and had dealt with him frequently — at least once a month. The officer explained that the defendant "usually understands what [she is] saying" and will speak with her in English even when he is intoxicated. However, because the defendant could not read English, the officer read the ALS form aloud to him. The officer read each line to the defendant, pausing after each to ask the defendant if he understood. The defendant affirmatively nodded his head after each line was read to him, signed the portion of the form stating that he was informed of his rights, and agreed to testing. According to the officer, at no point during this interaction did the defendant indicate that he was having difficulty understanding her, and she observed nothing to indicate that he could not understand her.

Prior to trial, the defendant moved to exclude the admission of the ALS form and corresponding breathalyzer test results from evidence, arguing that he did not sufficiently understand the rights outlined in the form because of his limited proficiency with the English language. The defendant took the position that, as with Miranda warnings, a person must knowingly, voluntarily, and intelligently consent to testing in order for the results to be admissible in a trial. He argued that his consent did not meet this standard because, due to the language barrier, he was unable to understand the ALS warnings read to him, and therefore could not consent to testing. Testifying mostly through an interpreter, the defendant explained that he signed the form because in the Congo, where he is from, people are required to do what police officers tell them to do. Following an evidentiary hearing on the motion, the trial court rejected the defendant's argument.[1] After considering the different approaches used by courts in other jurisdictions, the court adopted what it characterized as the "more reasoned approach," which requires only that the officer reasonably convey the warnings in a reasonable manner. Applying that standard to the facts of the case, the trial court concluded that, given the officer's prior history with the defendant and the defendant's statements to her that he spoke English, the officer conveyed the warnings in a reasonable manner. The defendant was thereafter convicted, and this appeal followed.

---

[1] The trial court rejected the defendant's attempt to analogize the statutory requirements with those needed for a valid Miranda waiver. The defendant, correctly, does not challenge the trial court's decision in this regard. Cf., e.g., State v. Ducharme, 167 N.H. 606, 614 (2015) (noting that "implied consent law questioning is not 'interrogation'" and therefore need not be preceded by Miranda warnings); State v. Barkus, 152 N.H. 701, 708 (2005) (recognizing that "it is settled law that a driver arrested for driving while under the influence has no constitutional right to refuse to provide a sample for a blood alcohol test").

The defendant argues that the trial court erred in adopting the reasonable methods approach as a basis for denying his motion in limine. According to the defendant, New Hampshire law requires that the driver understand the ALS warnings, and, therefore, that it must be established that "no deficit in English-language fluency caused the driver to fail to understand the statements on the ALS form." It follows, in the defendant's view, that "to discharge their obligations under RSA 265-A:8, the police must read (or provide in writing) the ALS warnings in a language the driver understands."

Resolving the issue on appeal requires us to determine the proper interpretation of RSA 265-A:8. See State v. Balch, 167 N.H. 329, 332 (2015). "The interpretation of a statute is a question of law, which we review de novo." Id. "We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole." Id. "When we interpret a statute, we look first to the statute's language, and, if possible, construe that language according to its plain and ordinary meaning." Id. During this exercise, we "can neither ignore the plain language of the legislation nor add words which the lawmakers did not see fit to include." State v. Cobb, 143 N.H. 638, 644 (1999) (quotation omitted). Thus, "[w]e do not read words or phrases in isolation, but in the context of the entire statutory scheme." Balch, 167 N.H. at 332. "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." Id. Where, as here, the issue is one of first impression in New Hampshire, we further look to other states' interpretations of similar statutory provisions for guidance. Cf. State v. Berrocales, 141 N.H. 262, 263-64 (1996) (looking to other states' interpretations of similar constitutional provisions for guidance in a matter of first impression).

Pursuant to New Hampshire's Implied Consent Law, a motor vehicle operator "shall be deemed to have given consent" to the tests it describes when "arrested for any offense arising out of acts alleged to have been committed while the person was driving . . . a vehicle . . . while under the influence of intoxicating liquor or controlled drugs," provided the tests are "administered at the direction of a law enforcement officer . . . having reasonable grounds to believe the person to have been driving . . . while under the influence of intoxicating liquor or controlled drugs." RSA 265-A:4 (Supp. 2018); see State v. Jenkins, 128 N.H. 672, 675 (1986) (noting that "[t]he act of taking the test is voluntary because the very act of driving on New Hampshire's public roads implies consent to take the test").

As we have explained in the past, "the purpose of the statute is to prevent the operation of cars by persons under the influence of intoxicating liquor," State v. Slater, 109 N.H. 279, 280 (1969), as well as to ensure "that an arrested individual makes an informed decision concerning whether or not to submit to a blood alcohol content test," State v. Dery, 126 N.H. 747, 752 (1985). Stated differently, "[t]he major premise of the implied consent law is

3

that it will aid the prosecution of the guilty and the protection of the innocent." State v. Gallant, 108 N.H. 72, 76 (1967) (quotation omitted).

To achieve this purpose, the statute "imposes a positive duty on the officer to do three equally important things before taking the test." Dery, 126 N.H. at 752 (quotation and ellipsis omitted). Pursuant to RSA 265-A:8, prior to testing an individual, an officer must:

(a) Inform the arrested person of his or her right to have an additional test or tests of his or her blood made by a person of his or her own choosing;

(b) Afford the arrested person an opportunity to request such additional test; and

(c) Inform the arrested person of the consequences of his or her refusal to permit a test at the direction of the law enforcement officer.

RSA 265-A:8, I. Failure to comply with these provisions results in the evidence being inadmissible "in any proceeding before any administrative officer and court of this state." RSA 265-A:8, III.

We are asked to determine what the term "inform" requires under the statute. Relying on case law from Wisconsin and Iowa, the trial court concluded that the statute requires that an officer need only reasonably convey the warnings to an individual. The defendant, however, urges us to adopt the approach taken by the New Jersey Supreme Court. We conclude that the approach adopted by the trial court conforms to our statute's purpose.

Contrary to the defendant's suggestion, the New Jersey approach outlined in State v. Marquez, 998 A.2d 421 (N.J. 2010), is incongruent with our legislative scheme. Indeed, the case is not only factually distinguishable from the case at hand, but also would, in our view, "add words [to our statute] which the lawmakers [in New Hampshire] did not see fit to include." Cobb, 143 N.H. at 644 (quotation omitted). In Marquez, the defendant "spoke no English, and the police had no reason to believe that he did." Marquez, 998 A.2d at 423. Nevertheless, the officers attempted to read the consent form to the defendant "all in English." Id. Even when the defendant confirmed, in Spanish, that he could not understand, the officers continued to read the form to him in English. Id. In fact, "[t]he police later candidly acknowledged that [the] defendant did not understand what was read to him," and it was "undisputed that [the defendant] d[id] not speak English." Id. at 423, 426. Ultimately, however, the defendant was found guilty of refusing to take the test. Id. at 426.

4

On appeal, the New Jersey Supreme Court concluded that, by its plain terms, the word "inform" "calls for more than a rote recitation of English words to a non-English speaker." Id. at 434. In the court's view, "in the context of the implied consent and refusal statutes," the word "inform" means "that [officers] must convey information in a language the person speaks or understands." Id. While we agree with the New Jersey Supreme Court that "inform" means "to communicate knowledge to" and "make acquainted," see id. (quotation omitted), we do not agree that this definition creates an affirmative obligation on the officer to deeply probe into an arrested person's preferred language in order to convey the warnings in the language of preference. Such a requirement would shift the statutory focus from the "positive duty" imposed on the officer, Dery, 126 N.H. at 752, to the subjective understanding of the defendant, see Marquez, 998 A.2d at 444 (LaVecchia, J., dissenting in part and concurring in judgment) (rejecting the majority's approach and noting that the legislature intended "to focus on the actions of the police officer because he or she is the actor addressed by the statutory language"). This approach would turn the statutory scheme on its head.

Rather, we think the better approach under our statute is the one employed by Wisconsin and Iowa. In State v. Piddington, 623 N.W.2d 528 (Wis. 2001), the Wisconsin Supreme Court held that its implied consent statute requires "the arresting officer under the circumstances facing him or her at the time of the arrest, to utilize those methods which [a]re reasonable, and w[ill] reasonably convey the implied consent warnings" to the arrested individual. Id. at 534-35. This approach, according to the court, ensures "that the driver cannot subsequently raise a defense of 'subjective confusion,'" because "whether the implied consent warnings were sufficiently administered must not depend upon the perception of the accused driver." Id. at 539. The court further noted that this interpretation advances the purpose and intent of the implied consent law, which is aimed at "facilitating the gathering of evidence against drunk drivers," as well as advising "the accused about the nature of the driver's implied consent." Id. at 538 (quotations and brackets omitted). Thus, in Wisconsin, "[w]hether the implied consent warnings given sufficiently comply with [the statute] depends upon the circumstances at the time of the arrest," and "correspondingly, whether the methods used were reasonable and would reasonably convey those warnings also depends upon the circumstances facing the arresting officer." Id. at 540. As the court explained, reasonableness "does not mean the officer must take extraordinary, or even impracticable measures to convey the implied consent warnings," because it "also requires consideration of the fact that alcohol dissipates from the blood over time, particularly after the subject has stopped drinking," and the "State cannot be expected to wait indefinitely to obtain an interpreter and risk losing evidence of intoxication." Id. at 542. This approach was similarly adopted by the Iowa Supreme Court in State v. Garcia, 756 N.W.2d 216 (Iowa 2008).

5

We are persuaded by the reasoning of the <u>Piddington</u> and <u>Garcia</u> cases, and accordingly hold that, to satisfy RSA 265-A:8, I, an officer need only reasonably convey the ALS warnings by reasonable methods. This approach properly balances the objectives of our implied consent law, which is not only to ensure "that an arrested individual makes an informed decision concerning whether or not to submit to a blood alcohol content test," <u>Dery</u>, 126 N.H. at 752, but also to prevent "the operation of cars by persons under the influence of intoxicating liquor," <u>Slater</u>, 109 N.H. at 280, by aiding in the "prosecution of the guilty," <u>Gallant</u>, 108 N.H. at 76 (quotation omitted). Applying an objective standard to the officer's conduct under the circumstances furthers the legislature's intent and ensures that the goals of the statute will be realized. <u>See</u> <u>Balch</u>, 167 N.H. at 332. Application of a subjective approach that considers the driver's understanding of the provided warnings runs the risk that the driver might use "the opportunity to delay the test to his benefit," <u>Harlan v. State</u>, 113 N.H. 194, 197 (1973), or "subsequently raise a defense of 'subjective confusion,'" <u>Piddington</u>, 623 N.W.2d at 539. Indeed, such subjective confusion is an accurate characterization of the claim raised by the defendant here. We conclude today that this <u>post</u> <u>hoc</u> subjective analysis would upset the balance of the statute.

Finally, nothing in the record suggests that the officer acted unreasonably under the circumstances. Here, there is evidence that the defendant: (1) knew the officer from prior encounters; (2) had spoken with the officer in English during these encounters; (3) told the officer twice at the police station that he spoke English; and (4) affirmatively indicated to the officer that he understood the statements on the form. Given these circumstances, the trial court did not err in concluding that the officer acted reasonably in reading the ALS form to the defendant in English and asking the defendant after each portion whether he understood what was read to him prior to proceeding with the additional testing.[2]

<u>Affirmed</u>.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

---

[2] Because we adopt the reasonable officer approach, which is focused on the objective conduct of the officer in administering the testing rather than the subjective understanding of the driver, we need not decide whether the defendant subjectively understood the ALS warnings read to him.